

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-09-00165-CR

ROY RAYMOND ROUSE, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 276th Judicial District Court
Marion County, Texas
Trial Court No. F13955

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

On August 10, 2008, Roy Raymond Rouse, Jr., shot his long-time neighbor and acquaintance, Rocky Hill, with a .22 caliber rifle. The shot struck Hill in the left side of the face, shattering twenty-two teeth. Hill survived the shooting, but required extensive medical care and numerous surgeries. Rouse was indicted on a charge of aggravated assault with a deadly weapon. After trial by jury, in which Rouse contended the shooting was accidental, Rouse was found guilty of aggravated assault with a deadly weapon[1] and sentenced to four years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice.

Rouse's only issue on appeal is that the evidence was factually insufficient for conviction. Because the evidence to support conviction is factually sufficient, the judgment of conviction is affirmed.

I.    **Background**

---

[1]Section 22.02(a)(2) of the Texas Penal Code provides that "[A] person commits an offense if the person commits assault as defined in § 22.01 and the person: . . . (2) uses or exhibits a deadly weapon during the commission of the

> (1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse;
>
> (2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or
>
> (3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.

TEX. PENAL CODE ANN. § 22.01(a) (Vernon Supp. 2009).

Hill lived only a block from Rouse, and the two had known each other for over ten years. Hill and Rouse's friendship was sporadic, and they usually did not get along well. On the day of the shooting, Hill was at home with his live-in girlfriend, Jennifer Rouse,[2] when a friend invited Jennifer and Hill to join him at the Kellyville Pub in Jefferson. As Jennifer and Hill were leaving for the pub at approximately 4:30 p.m., they saw Rouse in his driveway and invited him to join them. Hill, Jennifer, and Rouse went to the pub together in Hill's truck. Once at the pub, the group drank beer and played pool.[3] Hill and Rouse drank six or seven beers each while at the pub, and Jennifer consumed three beers.

Around 10:00 p.m., Jennifer decided to leave. As she began to drive away in Hill's truck, Hill jumped in the back of the truck and left with her,[4] leaving Rouse at the pub. The two returned to Hill's residence. Shortly after arriving home, Hill decided to go to Rouse's house to check on Ashton Moore, Jennifer's sixteen-year-old son.[5] The evidence is in dispute as to what happened when Hill arrived at the residence, but it is clear that Hill returned home shortly thereafter, for Jennifer. Jennifer and Hill then returned to check on Moore (who was not home at

---

[2]Jennifer is Rouse's sister.

[3]Rouse was on community supervision for burglary on the date of the shooting, and as a result, was not permitted to consume alcoholic beverages or to keep or maintain firearms.

[4]Much of the testimony regarding the events of the evening of August 10, 2008, is disputed. The background provided here is based on that testimony which is undisputed.

[5]Moore resided at 189 Waterwood Loop, in a residence left to him by his deceased grandmother. Rouse lived in a small building within a few feet of Moore's residence.

the time) when Hill encountered Rouse. A scuffle ensued, and Rouse grabbed a rifle. As Hill and Jennifer turned to leave, Rouse shot Hill in the left side of his face. Rouse immediately apologized and called for emergency medical assistance. Meanwhile, Hill and Jennifer walked a short distance to a neighbor's house, and an ambulance was summoned. Hill was transported to Good Shepherd Medical Center and then transferred to Parkland Hospital in Dallas, where he underwent multiple surgeries and a long period of convalescence. Jennifer accompanied Hill to the hospital and remained by his side until he was finally released in approximately November 2008.

Rouse was arrested and photographed on the evening of the shooting. He posted bail the following day, and disappeared. Approximately seven months later, Rouse was arrested in Upshur County.

## II.    Factual Sufficiency of the Evidence

When conducting a factual sufficiency review of the evidence, we begin with the presumption that the evidence was legally sufficient. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). All evidence is viewed in a neutral light, favoring neither party. *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We are to determine if the evidence supporting the verdict, although legally sufficient, is nevertheless so weak that the verdict is clearly wrong or manifestly unjust or whether

4

the verdict is against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 414─15.

While a factual sufficiency review allows a very limited degree of "second-guessing" the jury, the review should be deferential, with a high level of skepticism about the jury's verdict before a reversal can occur. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *Watson*, 204 S.W.3d at 417.

The factual sufficiency of the evidence should be measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Hernandez v. State*, 190 S.W.3d 856, 863 (Tex. App.—Corpus Christi 2006, no pet.). A hypothetically correct jury charge in this case would require the State to prove beyond a reasonable doubt that (1) Rouse (2) intentionally, knowingly, or recklessly (3) caused bodily injury to Hill (4) by shooting Hill with a firearm.

There is no dispute that Rouse shot Hill with a firearm, causing bodily injury to Hill. The dispute centers on Rouse's mental state. Rouse contends that the shooting was accidental. The State was required to prove, beyond a reasonable doubt, that Rouse intentionally, knowingly, or recklessly shot Hill. The jury was properly instructed as to the definitions of the required mental state. The mental culpability of a defendant is of such a nature that it generally must be inferred from the circumstances in which a prohibited act or omission occurs. A mental state is concealed within the mind of an individual, and can only be determined from his or her words, acts, and

5

conduct. *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998). We, therefore, review the testimony for circumstantial evidence bearing on whether Rouse was intentional, knowing, or reckless in shooting Hill.

### A. Testimony of Rocky Hill

Hill's testimony differs from that of Rouse and Jennifer, beginning with Rouse's conduct in the pub. After they started drinking, Hill testified that Rouse began to say things to irritate Hill. When Rouse drinks, he gets "ten foot tall" and he began to make comments indicating that he had sex with Hill's mother. This conduct persisted for over an hour, and each time, Hill walked away to avoid conflict. While Hill admitted that his memory is not good due to several head traumas, he did not recall any scuffling in the pub, just Rouse "talking smack."

When Jennifer was ready to leave, he had to jump in the back of the truck because she was already driving away. They left Rouse at the pub.

When Hill and Jennifer got home, Jennifer asked Hill to go to Rouse's to check on her son. Believing Rouse to still be at the pub, Hill drove the short distance to Rouse's home, where he was met by Rouse pointing a gun at him when he got out of the truck. Rouse sent a few text messages to Hill before Hill arrived at Rouse's house, and Hill responded to those messages. The record does not indicate the content of the messages from Rouse or Hill's response to those messages.

At that point, Hill returned home and asked Jennifer to come with him to check on Moore, because Rouse had a gun. Hill returned in spite of the fact that he was initially met at gunpoint

6

because Jennifer was determined to check on her son, and he was not going to let her go alone.

As Jennifer was going into the house to check on Moore, Rouse came "barreling out the door" around the porch. The two scuffled and wrestled. Although Hill did not think he struck Rouse during the scuffle, he might have done so. When Jennifer came out of the house about a minute later, Rouse and Hill were no longer scuffling, but they were arguing. Rouse was about six to eight feet from Hill when Rouse pulled out the .22 rifle, which was leaning against the porch. Rouse pointed the gun at Hill.

Hill testified that Rouse had shot at him in the past, so Hill asked Rouse what he was going to do with the gun. Then, Hill grabbed the gun and said "shoot me then," at which point Rouse slung the gun to the ground. Hill had Jennifer by the arm at that point, and they began to walk away. As they were walking away, Rouse yelled, and Hill turned around. As he did so, the bullet caught him in the left jaw. Hill was eight to ten feet from Rouse when he was shot. Rouse ran over to Hill to see if he was okay and rubbed him on the back. Jennifer and Hill then walked a short distance to a neighbor's house to call an ambulance. As they were walking away, Rouse called 9-1-1.

After the criminal case was filed, Hill and Jennifer visited two or three times with the county attorney. When Jennifer learned the case was going to court, she left Hill, and Hill did not see her again until the time of trial.

## B.    Testimony of Jennifer Rouse

Jennifer testified that as they were leaving for the pub, Rouse was standing in his yard, and Hill invited him to join them.    Jennifer did not think this was a good idea because Hill and Rouse do not get along, and Hill is not a good person to be around when he is drinking.

While at the pub, they laughed, talked, played pool, and had a good time.    When Jennifer went outside to leave (at approximately 9:30 or 10:00 p.m.), she heard hollering from the pub and went back inside.    Hill had started to pick a fight with Rouse, and head-butted Rouse.    Irritated with Hill's behavior, Jennifer got in the truck and drove away.    Hill chased her down and jumped in the back of the truck.

When they returned home, Hill got in the truck and said he was going to go "finish this." After he left, Jennifer could hear Hill screaming and hollering at Rouse's house.    Hill returned home a short while later and told Jennifer she needed to go over and check on her son and that if she did not get in the truck, he would put her in the truck.    When they arrived at Rouse's home, Jennifer went into the house looking for Moore, but he was not there.    As she was coming out of the house, Jennifer heard Hill screaming at Rouse, and then saw Hill hit Rouse in the face.    Rouse threw his hands up, said he did not want to fight, and asked Hill to leave.    Hill did not relent, and hit Rouse a few more times in the face.    Hill then went to his truck saying, "I've got something for you."

8

Hill does not own a gun, but he carries brass knuckles, tools, screwdrivers, and wrenches under the seat of his truck. Hill returned with his hand behind his back. At that point, Rouse grabbed the gun. Hill grabbed the gun, put it to his own face, and told Rouse to shoot. Hill then shoved the gun back, and Rouse fell down while still holding the gun. Jennifer was already walking toward the truck when she heard the gunshot. Hill grabbed her arm and said, "[L]et's go." Then, he put his hand on his mouth and, when he pulled his hand away, he was bleeding. After Rouse shot Hill, Rouse put his hand on Hill's shoulder and told him that he was sorry and that he did not mean to shoot him.

Jennifer heard Rouse calling 9-1-1 from his cell phone as she and Hill walked a short distance to a neighbor's house for help.

Jennifer testified that she told Shawn Cox, an investigator with the Marion County Sheriff's Office, everything she knew about the shooting incident. She did not, however, tell Cox about the argument at the pub or about the head-butting incident. Jennifer testified that Hill asked her not to say anything to Cox about the fact that Hill went back to the truck to "get something" just prior to the shooting. In her statement to Cox, Jennifer did not indicate that Hill forced her to the truck to go to Rouse's house. In fact, she told Cox they went to Rouse's to check on Moore. Likewise, Jennifer said nothing to Cox about Hill hitting Rouse in the face or knocking Rouse down with the rifle. She simply told Cox that as she and Hill turned to leave, Hill grabbed her by the arm and she heard the shot.

9

Jennifer admitted at trial that her trial testimony differed from her statement to Cox. Jennifer explained that as the trial date drew near, Hill told her to repeat her original statement, and she did not want to risk going to jail by doing so. Jennifer was afraid of Hill; he was very controlling, aggressive, and violent.

### C.  Testimony of Ashton Moore

Moore testified that he has known Hill for ten years or more, since his mother (Jennifer) and Hill have been together. Even though Hill and Moore are not related, Moore thinks of Hill as a member of the family.

Moore has seen Hill fight before, but not with a weapon. He has never seen Hill use anything but his fists in a fight. Hill fought Kyle Roller once, but did not use weapons.

Rouse is Moore's uncle, and Moore and he live next to each other. Moore lives in the trailer his grandmother left to him, and Rouse lives in a little building next to it.

Moore knows that when Rouse drinks too much, he gets aggressive. Rouse has been physically aggressive with Moore, and has slapped him.

Rouse has threatened to kill Hill "plenty of times." Moore recalls an incident in which Hill and Rouse got into an argument and Rouse fired the .22 rifle in the direction Hill was hiding. After having shot at Hill, Rouse did not say anything, he just smiled like always. Hill testified that Rouse "just always got a smile."

10

Moore was not home at the time of the shooting, but became aware of it when Hill and Jennifer arrived at the neighbor's house where Moore was visiting. After getting help, Moore walked to Rouse's house where he found Rouse standing on the porch. Rouse did not act worried, and he had a "little smirk" like he had done something. When Moore asked Rouse what happened, Rouse simply said, "I shot Rocky."

According to Moore, Rouse usually kept the rifle in the house, in the corner of his room.

### D.      Testimony of Roy Raymond Rouse, Jr.

Prior to the day of the shooting, Rouse and Hill had arguments, but only one that resulted in a physical altercation, approximately fifteen years earlier. Moore's testimony that Rouse threatened to kill Hill prior to the night of the shooting and in fact had fired that same gun at Hill in the past, was untrue. Hill had been physically aggressive toward Jennifer several times in the past, and he was under a protective order. Hill and Jennifer reunited in spite of the protective order.

Rouse witnessed Hill fight Roller approximately two years before the shooting. In that fight, Hill used a beer bottle, an extension for a ratchet, and a WD-40 can.

While at the pub, Hill, Jennifer, and Rouse played pool and drank beer; there were no disagreements. Not long before Jennifer decided to leave, Hill accused Rouse of "saying some things," and Hill head-butted Rouse. Rouse denied saying anything to incite Hill.

After Jennifer and Hill left, Rouse got a ride home from the pub with a friend. While at

11

home, Rouse received three or four text messages from Hill, one of which called Rouse out to fight, but Rouse did not respond. Instead, he decided to relax and watch a movie. It was not long before Rouse heard Hill out in the street screaming at him. Rouse chose to remain in the house. He never handled the gun or went outside.

Approximately fifteen minutes later, when Rouse was outside using the restroom, Hill and Jennifer arrived in Hill's truck. When Rouse came around the building, Hill was standing by the road. Upon seeing Rouse, Hill charged him and punched him twice in the face. Rouse did not attempt to return the blows, but did try to block them. Rouse told Hill he did not want to fight and asked him to leave several times. After hitting Rouse, Hill ran to his truck and told Rouse he had "something" for him. Hill proceeded to look under the seat of his truck where Rouse knew Hill kept tools, wrenches, and brass knuckles.

As Hill returned from the truck, Rouse grabbed the gun from the porch and stuck it out, trying to keep Hill away. Hill reached up with one hand and grabbed the gun and said, "[I]f you're going to shoot me, shoot me." Hill then shoved Rouse backward, and Rouse fell down. Rouse was holding the rifle with his right hand, and his hand was "around the trigger." When Rouse hit the ground, Hill was still telling Rouse to shoot him. In a matter of seconds, the gun fired. Rouse did not aim the gun, and only had it in his hand because he thought Hill was coming at him with some type of weapon. Rouse never saw a weapon and was not hit with a weapon. The two were only a foot or so apart when the gun fired.

12

When Rouse pulled the gun out, he had no intent to use it, and did not know it was loaded. The gun accidently went off in his hand. Hill was facing Rouse when the gun fired, and when Hill grabbed Jennifer's arm, Hill had nothing in his hands.

After the shot was fired, Rouse called 9-1-1 for help. Rouse did not tell the 9-1-1 operator the shooting was an accident. Rouse did not tell the dispatcher or the deputies who investigated the shooting that Hill went to the truck for a weapon.

Rouse testified that he usually keeps the safety of the rifle on and does not keep a round in the chamber at all times. He does not know why the gun was loaded. When the gun fired, the safety was off, a round was in the chamber, and Rouse had his finger on the trigger.

Rouse was arrested and photographed on the night of the shooting. At trial, Rouse could only identify one area on one photograph that appears to be a bruise.

## III.     The Evidence Is Factually Sufficient

Rouse contends that a neutral review of all of the evidence demonstrates that proof of his guilt is so obviously weak as to be clearly wrong, manifestly unjust, and against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 414–15. Rouse points out that Hill's memory is by his own admission unreliable. Further, Rouse contends that the presence of blood splatter on his clothing, coupled with his immediate apology, weigh against Hill's version of events and corroborate Rouse's version that the shooting was accidental.

13

Rouse further calls into question the State's failure to produce medical or other expert testimony that could have shown the distance from which the gun was fired. Rouse had (as described by Cox) blood on his hands and "a little bit of blood splatter on his clothes." The State could have produced an expert, contends Rouse, to explain whose blood it was and the significance of the splatter.

Rouse contends that if Hill pushed him down (as Rouse testified) and the rifle accidentally fired as he fell, it would be reasonable to see some blood splatter on Rouse's clothes and the possibility of this would decrease as the distance between Rouse and Hill increased. If Hill's version of events is correct, and Rouse slung the gun down and then picked it up and aimed it at Hill as he was walking away, there would be no blood splatter on Rouse's clothing as a result of the shooting.

Rouse's theories on blood splatter and the location of same were not presented to the jury. There was no expert, as Rouse points out, called by the State or by Rouse, to explain the significance of blood splatter to the jury. Further, such discrepancies were not pointed out to the jury in argument of counsel at the conclusion of the case. The only evidence before the jury on this issue was Cox's testimony that a single photograph introduced by the State depicted a small blood splatter in the upper right pocket area of Rouse's pants. The jury could have inferred, from looking at this photograph (and in comparison with the photographs of the pants worn by Hill at

the time of the shooting, which were covered in blood) that indeed, Rouse was six to eight feet away at the time the rifle was fired.

Next, Rouse claims that Jennifer's testimony raised a reasonable hypothesis that the shooting was accidental and that Rouse, therefore, did not have the culpable mental state necessary to sustain a conviction for aggravated assault. Rouse submits that this Court is bound to consider that reasonable hypothesis. *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997).

A reviewing court conducting a factual sufficiency analysis necessarily considers any reasonable alternative hypothesis raised by the evidence. The very nature of a factual sufficiency review requires the court to consider all of the evidence presented at trial and not just that which is favorable to the verdict. *See Cain v. State*, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). However, the mere existence of an alternative reasonable hypothesis does not render the evidence factually insufficient. Even when an alternative reasonable hypothesis is raised by the evidence, the standard of review remains the same. A verdict may be overturned only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996).

Jennifer's trial testimony tends to support the claim of an accidental discharge of the firearm. However, Jennifer's credibility was called into question because her trial testimony differed in several important respects from the statement she gave to Cox shortly after the shooting. Jennifer admitted at trial to giving two completely different versions of what occurred

15

on the evening of August 10, 2008. While Jennifer testified that Hill head-butted Rouse in the pub and hit Rouse several times in the face later at Rouse's house, the physical evidence tends to corroborate at least that portion of Jennifer's statement to Cox, in which she failed to mention the hitting and head-butting. The jury saw photographs which do not indicate the presence of injury to Rouse's face consistent with Jennifer's testimony.

Even though Jennifer explained that her statement to Cox was incomplete because she was afraid of Hill, the jury was free to disregard any part of Jennifer's testimony it did not find credible. *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994) (it is within exclusive purview of jury to determine credibility of witnesses and weight to be given to statement of a witness). In this case, the jury apparently was not convinced that Jennifer's courtroom testimony was entirely credible.

Rouse complains further that Hill qualified several of his answers with the explanation that his memory was not good due to several head traumas when testifying that he did not think there was any physical contact at the pub and that he could not remember if he sent derogatory text messages to Rouse after they left the pub. In reviewing all of the evidence, we again note no physical injury to Rouse, which tends to corroborate Hill's testimony.

Hill's testimony is further corroborated by Moore, who testified that when Rouse drinks too much, he gets aggressive. Hill testified that when Rouse drinks, "he gets ten foot tall."

16

Moore further testified that Rouse previously fired the .22 rifle at Hill when the two were arguing. Hill also testified that Rouse shot at him in the past.

Rouse's immediate apology to Hill and his 9-1-1 call after the shooting tend to corroborate his contention that the shooting was accidental. We believe Rouse cites sufficient conflicting evidence to support an argument that another reasonable jury, weighing the evidence and assessing the credibility of the witnesses, could have reached a different verdict from the one reached by this jury. Upon objective review of the record, however, we cannot agree with Rouse that the evidence supporting the verdict is so weak as to be clearly wrong or manifestly unjust. We further do not find the verdict to be against the great weight and preponderance of the conflicting evidence. We, therefore, conclude that the evidence is factually sufficient to support the verdict of guilt.

Accordingly, we affirm the judgment.


Jack Carter
Justice


Date Submitted:        January 29, 2010
Date Decided:          February 24, 2010

Do Not Publish